**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**VANGUARD GRAPHICS LLC D/B/A**
**VANGUARD PRINTING, and KOURSA, INC.,**

       **Plaintiffs,**       **Case No. 3:18-CV-55**
                   **(NAM/ML)**

**v.**

**TOTAL PRESS SALES & SERVICE, LLC,**

       **Defendant.**
_____

**TOTAL PRESS SALES & SERVICE, LLC,**

       **Third-Party Plaintiff,**

**v.**

**BRITTON SERVICES, INC., TRANS AMERICAN**
**TRUCKING SERVICE, INC., TRUE NORTH**
**EXPRESS, INC., BLUE HAWK CARRIER, INC.,**
**and KML CARRIERS, LLC,**

       **Third-Party Defendants.**
_____

**APPEARANCES:**

BOND SCHOENECK & KING, PLLC
Brendan M. Sheehan, Esq.
Thomas R. Smith, Esq.
One Lincoln Center
110 W. Fayette St.
Syracuse, NY 13202
_Attorneys for Vanguard Graphics LLC d/b/a_
_Vanguard Printing and Koursa, Inc._

WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
Andrew S. Holland, Esq.
Peter A. Lauricella, Esq.
200 Great Oaks Blvd., Suite 228
Albany, NY 12203
_Attorneys for Total Press Sales & Service, LLC_

HURWITZ, FINE LAW FIRM
Steven E. Peiper, Esq.
1300 Liberty Building
424 Main Street
Buffalo, NY 14202
*Attorneys for Britton Services, Inc.*

HILL, RIVKINS LAW FIRM
Marc I. Kunkin, Esq.
John J. Sullivan, Esq.
45 Broadway, Suite 1500
New York, NY 10006
*Attorneys for Trans American Trucking Service, Inc.*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

## I.   INTRODUCTION

Plaintiffs Vanguard Graphics LLC d/b/a Vanguard Printing and Koursa, Inc.

(collectively, the "Plaintiffs") bring this action under the Carmack Amendment, 49 U.S.C. §

14706, and state common law, asserting claims arising from damage to a printing press.  (Dkt.

No. 1).  Now before the Court are motions for summary judgment by Defendant Total Press

(Dkt. No. 55), Third-Party Defendant Trans American (Dkt. No. 56), and Third-Party

Defendant Britton Services (Dkt. No. 62).  For the reasons that follow, the motions are

granted in part and denied in part.

## II.   BACKGROUND

### A.  Procedural History

Plaintiffs commenced this action in January 2018, asserting at least six claims against

Defendant Total Press for alleged breach of contract and negligence stemming from damage

to a printing press that Plaintiffs had recently purchased.  (Dkt. No. 1).  Defendant Total

Press then filed a Third-Party Complaint against several Third-Party Defendants seeking

indemnification and contribution for the Plaintiffs' damages.  (Dkt. No. 15).  At the close of discovery, several of the parties filed motions for summary judgment, which are now before the Court.  (Dkt. Nos. 55, 56, 62).[1]

### B.  Record Before the Court[2]

In 2014, Plaintiff Koursa, Inc. entered into an agreement to purchase a Heidelberg Sunday 4000 printing press (the "Press") from a seller located in Denmark.  (Dkt. No. 70, ¶ 1).  Koursa paid approximately $900,000 for the Press, which was 13 years old.  (*Id.*, ¶ 3).  On December 22, 2014, Koursa entered into an agreement (the "Services Agreement") with Defendant Total Press to transport the Press to the United States.  (*Id.*, ¶ 4; *see also* Dkt. No. 1, pp. 19–31).  Under the Services Agreement, Total Press was responsible for dismantling the Press in Denmark, transporting it to the United States, and installing it at a site to be designated by Koursa.  (*See* Dkt. No. 1, pp. 19–20, Services Agreement, ¶ 1(e)).

The Services Agreement established a payment schedule which required Koursa to make certain payments when specific project milestones were achieved.  (Dkt. No. 1, pp. 20–21, Services Agreement, ¶ 3(b)).  Koursa and Total Press agreed that "time [was] of the essence," and that Total Press would "prosecute the Services and Commissioning diligently to . . . complete the Services and Commissioning in the time provided for in this Agreement and in the most expeditious manner consistent with the interest of Koursa."  (*Id.*, p. 23, Services Agreement, ¶ 8(c)).

---

[1] The case was reassigned to the undersigned on July 30, 2020.  (Dkt. No. 78).

[2] The facts have been drawn from the parties' statements and counterstatements of material fact, (Dkt. Nos. 55-1, 61, 62-1, 68-2, 69-2, 70), and the parties' attached exhibits, depositions, and declarations (*see generally* Dkt. Nos. 55–56, 62, 68–69, 73–74).

The Services Agreement further provided that: "Total Press assumes all liability for loss to property at the Current Site and at Koursa's Site due to Total Press', its employees, agents or subcontractors actions or negligence during the performance of Services and Commissioning periods; except to the extent that such claims arise out of negligence or legal fault of Aller [(the seller)] at the Current Site or Koursa at Koursa's Site or that of their respective employees or subcontractors." (*Id.*, pp. 22–23, Services Agreement, ¶ 8(b)).

After Total Press had dismantled and prepared the Press for shipping, Koursa advised Total Press that circumstances had changed and the Press would need to be stored for an unknown period of time prior to it being installed at the new location. (Dkt. No. 70, ¶ 6). The Press was stored by Third-Party Defendant Trans American Trucking Services in New Jersey. (*Id.*, ¶ 7). At the time the storage site was selected, the parties did not know how long the Press would need to be stored there. (*Id.*, ¶ 8). On or about March 13, 2015, Koursa and Total Press amended the original contract to address the storage of the Press and the change in circumstances. (*Id.*, ¶ 9; *see also* Dkt. No. 1, pp. 33–36 ("Amended Services Agreement")). The Amended Services Agreement defined "Services" to include "Total Press' (i) loading of the Equipment onto storage trucks at the US Port; (ii) transporting the Equipment from the US Port to the Storage Site; (iii) storage of the Equipment at the Storage Site; (iv) loading of the Equipment onto trucks at the Storage Site; and (v) transporting the Equipment to Koursa's Site, including all freight and services costs, in accordance with this Amendment." (Dkt. No. 1, p. 33, Amended Services Agreement, ¶ 1(b)).

On or about June 22, 2016, Koursa and Total Press further amended the Services Agreement to designate the Vanguard facility in Ithaca, New York as the site for installation of the Press. (Dkt. No. 70, ¶ 10; *see also* Dkt. No. 1, pp. 38–43 ("Second Amended Services

Agreement")).  The Second Amended Services Agreement also assigned Koursa's interest in the agreement to Vanguard Printing.  (*Id.*; *see also* Dkt. No. 1, p. 40, Second Amended Services Agreement, ¶ 4).  The Second Amended Services Agreement defined the "Services" as "Total Press' (i) loading of the Equipment onto trucks at the Storage Site; (ii) transporting the Equipment from the Storage Site to the Koursa Site; . . . [and] (v) the turn-key completion of the rigging and installation of the Equipment at the Koursa Site, including all freight and Services costs . . . ."  (Dkt. No. 1, p. 38, Second Amended Services Agreement, ¶ 1(b)).

In June 2016, Total Press entered into an agreement with Third-Party Defendant Britton Services, Inc. ("Britton") to assist with unloading and installing the Press at the Vanguard facility.  (Dkt. No. 62-1, ¶¶ 3–5; Dkt. No. 68-2, ¶¶ 3–5).  In late July 2016, the Press was transported from the storage location in New Jersey to the Vanguard facility in Ithaca.  (Dkt. No. 70, ¶ 11).  On July 30, 2016, as Britton was offloading the equipment in Ithaca, a portion of the Press (known as unit #3 or the magenta unit) fell to the ground after Britton's employees placed it on wooden blocks, one of which failed to hold the weight of the Press and broke apart.  (*Id.*, ¶ 15; *see also* Dkt. No. 62-1, ¶¶ 10–11; Dkt. No. 55-7, pp. 138–39; Dkt. No. 55-5, p. 52).

On August 6, 2016, Nicholas Karabots, the principal owner of Koursa and then part-owner of Vanguard, sent an e-mail to Jeffrey Vargo of Total Press stating that:

> Word from Vanguard is that there was a significant amount of damage to some of the press components during the move from NJ to Vanguard's plant . . . and the off loading and placement of the equipment in the plant itself.
>
> I have no idea at this point as to the extent of the damage and will leave it to Vanguard and Total Press to define . . . .  [T]his note is meant only to put Total Press and its insurers on notice.

5

(Dkt. No. 61-1, p. 1).  Mr. Vargo replied on the same day with the following response:

> I want to acknowledge that we are aware of this situation and take full responsibility.  This is exactly why I went to the NJ facility to over see the loading of the last trucks.
>
> [A Total Press employee] will be at Vanguard Monday am to determine what action is necessary, to properly and quickly remedy the issue.  We will document the issue as well as the actions taken.

(*Id.*).

Due to the dispute over the repair and damages to the Press, Total Press did not have the funds to continue paying progress payments to Britton.  (Dkt. No. 62-1, ¶ 14; Dkt. No. 68-2, ¶ 14).  Total Press did not issue appropriately earned progress payments to Britton as it was obligated to do under the terms of the contract.  (Dkt. No. 62-1, ¶ 15; Dkt. No. 68-2, ¶ 15).  When Total Press "failed to respond to Britton's repeated requests for late and insufficient progress payments, Britton left the jobsite in mid-September 2016."  (Dkt. No. 62-1, ¶ 16; Dkt. No. 68-2, ¶ 16).

In January 2018, Vanguard and Koursa filed this action against Total Press seeking damages for alleged breach of contract.  (Dkt. No. 1).  Specifically, Vanguard alleges that the damages to the Press during the offloading in Ithaca delayed installation of the Press until May 2017.  (*See* Dkt. No. 70, p. 14, ¶ 45).  Vanguard claims that as a result, it had to pay to repair the Press and lost printing contracts.  (*See generally* Dkt. No. 70, pp. 14–21, ¶¶ 42–91).  Total Press then filed a Third-Party Complaint seeking contribution and indemnification from various subcontractors involved in the transport, storage, and installation of the Press.  (Dkt. No. 15).

### III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24. Further, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and the grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citing *Dister v. Continental Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case." *Scott v. Coughlin*, 344 F.3d 282,

287 (2d Cir. 2003).  To that end, "sworn statements are more than mere conclusory allegations subject to disregard [ ]; they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion."  *Id.* at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

## IV.   DISCUSSION

Before the Court are three motions for summary judgment.  (Dkt. Nos. 55, 56, 62).  The Court will address each in turn.

### A.  Total Press's Motion for Summary Judgment

Total Press seeks summary judgment on all of Plaintiffs' asserted claims under the Carmack Amendment and state common law.  (Dkt. Nos. 55, 74).  Plaintiffs oppose the motion.  (Dkt. No. 70).

#### 1.  Carmack Amendment Claim

First, Total Press argues that Plaintiffs' Carmack Amendment claim "must be dismissed as Total Press acted as a broker," and the Carmack Amendment to the Interstate Commerce Act of 1887, 49 U.S.C. § 14706(d), only governs the liability of carriers for loss or damage to goods transported in interstate commerce.  (Dkt. No. 55-2, pp. 4–5).  Total Press asserts that it never "owned or leased a vehicle that transported even one iota of the subject press, nor did Total Press employ any person who was responsible for the transportation of the press."  (*Id.*, p. 5).  Total Press asserts that it simply "arranged for the transportation of the press through carriers such as KML Carriers and True North Express."  (*Id.*).

In response, Plaintiffs assert that Total Press is subject to the Carmack Amendment because it agreed to transport the Press in accordance with the Services Agreement.  (*See* Dkt. No. 70-1, pp. 12–15).  Plaintiffs claim that Total Press agreed to provide "door-to-door"

service which included "turn-key completion of dismantling and loading the Equipment into containers at the current site, transporting the Equipment from the Current Site to the Koursa Site and the rigging and installation of the Equipment at Koursa's Site, including all freight and Services Costs." (*Id.*, p. 14). Plaintiffs claim that "Total Press thus bound itself to transport the Press and qualified as a 'carrier' under the Carmack Amendment[,] but, [a]t the very least questions of fact exist which preclude this Court from finding as a matter of law that Total Press acted as a 'broker' with respect to the Press." (*Id.*).

Under the Carmack Amendment, "a carrier is liable for damages incurred during a shipment of goods, whereas a broker—someone who merely arranges for transportation—is not liable." *Tryg Ins. v. C.H. Robinson, Worldwide, Inc.*, 767 F. App'x 284, 285 (3d Cir. 2019). Specifically, a "carrier" is liable for "the actual loss or injury to the property" for damage caused during the transportation. 49 U.S.C. § 14706(a)(1). A "motor carrier" is defined as "a person providing commercial motor vehicle . . . transportation for compensation," 49 U.S.C. § 13102(14), whereas a "broker" is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation," 49 U.S.C. § 13102(2). Notably, "transportation" is defined as "services related to [the movement of property], including arranging for, receipt, delivery . . . , transfer in transit, . . . handling, . . . and interchange of property." 49 U.S.C. § 13102(23)(B). The implementing regulation provides that:

> Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments

9

> which they are authorized to transport and which they have
> accepted and legally bound themselves to transport.

*See* 49 C.F.R. § 371.2(a).

In deciding whether an entity acted as a carrier or a broker, courts "look to how the party acted during the 'specific transaction' at issue, which includes 'the understanding among the parties involved [and] consideration of how the entity held itself out.'" *Louis M. Marson Jr., Inc. v. Alliance Shippers, Inc.*, 438 F. Supp. 3d 326, 331 (E.D. Pa. 2020) (citations omitted). And "[b]ecause the analysis of whether defendant is a carrier or a broker is fact specific, it may not be appropriate for summary judgment." *Id.* at 332 (citing *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1302 (11th Cir. 2018) ("This is necessarily a case-specific analysis, and as a result, summary judgment might not be appropriate in many cases.")).

Here, the record shows that Plaintiffs hired Total Press to disassemble the Press in Denmark, transport it to a designated site in the United States, and then reassemble it at a location of Total Press's choosing. (Dkt. No. 1, pp. 19–31, Services Agreement). Pursuant to the Services Agreement, Total Press took general responsibility for coordinating the transportation of the Press to the United States, regardless of whether it actually moved it itself. (*Id.*, p. 19 (Total Press agreed to "transport the [Press] to the premises designated by Koursa")). Thus, Total Press appears to have held itself out as a carrier by agreeing to transport the Press. Further, the record shows that Jeffrey Vargo, Total Press's owner and President, understood that Total Press's contractual obligations included transportation of the Press. (Dkt. No. 55-7, pp. 24–25, 48–49). This included Total Press's hiring of Weiss-Rohlig and other companies to assist with the shipping and transportation process. (*Id.*, pp. 44, 254–58). Mr. Vargo also stated that he had a role in coordinating the sequence of trucks

10

and Press components from the storage facility in New Jersey to the installation site in Ithaca.  (*Id.*, p. 118).

On the other hand, Mr. Vargo also stated that the transportation was accomplished through the use of "common carriers" at all phases of the transportation between Europe and the United States.  (Dkt. No. 55-7, pp. 55–57, 74–75).  Mr. Vargo stated that Total Press hired a shipping firm, Weiss-Rohlig, to arrange the transatlantic shipping and acceptance of the Press when it arrived at port in New Jersey.  (*Id.*, pp. 45–46).  It is undisputed that Total Press did not, itself, transport the Press from Denmark to New Jersey, or from there to Ithaca.  (*See* Dkt. No. 1, Services Agreement, ¶ 8(j); *see also* Dkt. No. 55-7, pp. 55–57).  Rather, Total Press hired various shipping firms to do so, thereby appearing to act more as a broker than a carrier.  (*See id.*).  Moreover, the Services Agreement appears to exclude Total Press from liability for damage during transport by limiting Total Press's liability for damages or loss to property "at the Current Site [in Denmark] and at Koursa's Site due to Total Press', its employees, agents or subcontractors' actions or negligence . . . ."  (Dkt. No. 1, pp. 22–23, Services Agreement, ¶ 8(b)).

Considering the record as a whole, the Court cannot determine as a matter of law whether Total Press acted as a carrier or a broker.  The record shows that material issues of fact remain as to Total Press's precise role in the transportation of the Press and the parties' understanding of the Services Agreement.  Accordingly, Plaintiffs' Carmack Amendment claim cannot be dismissed at this time.  *See Alliance Shippers, Inc.*, 438 F. Supp. at 330–34 (denying summary judgment on the plaintiff's Carmack Amendment claim where issues of fact precluded the court from determining whether the defendant was a broker or a carrier as a matter of law); *Ciotola v. Star Transp. & Trucking, LLC*, No. 19-CV-753, 2020 WL

11

4934592, at *12–14, 2020 U.S. Dist. LEXIS 152963, at *35–39 (M.D. Pa. Aug. 24, 2020) (denying summary judgment on the plaintiff's Carmack Amendment claim and noting that state law claims could be preempted if the defendant was a carrier); *Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc.*, No. 09-CV-2365, 2011 WL 671747, at *5–8, 2011 U.S. Dist. LEXIS 17752, at *15–26 (S.D.N.Y. Feb. 18, 2011) (collecting cases and denying summary judgment on the plaintiff's Carmack Amendment claim where issues of fact existed as to the defendant's status as a broker or carrier).[3]

### 2. Common Law Claims[4]

Total Press also moves to dismiss each of Plaintiffs' claims under Pennsylvania common law, (Dkt. No. 55-2, pp. 6–16), and Plaintiffs oppose Total Press's arguments, (Dkt. No. 70-1, pp. 15–30).

#### a. Breach of Contract

Total Press argues that Plaintiffs' breach of contract claim should be dismissed "because they cannot establish their own performance under the contract." (Dkt. No. 55-2, p. 11). Specifically, Total Press asserts that Plaintiffs breached the Services Agreement by

---

[3] Total Press also argues that if it is subject to the Carmack Amendment, the Court must find that Plaintiffs' damages are limited to actual loss. (Dkt. No. 55-2, pp. 5–6). Because the applicability of the Carmack Amendment cannot be determined as a matter of law, the Court does not reach this issue. The Court further notes that Plaintiffs' Carmack Amendment claim would preempt their state law causes of action if a jury found that Total Press was a carrier. *See Alliance Shippers, Inc.*, 438 F. Supp. at 336–37 (noting that the plaintiffs' Carmack Amendment and state law claims could only proceed as alternative theories of liability).

[4] The Services Agreement includes a choice of law provision that states: "This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Commonwealth of Pennsylvania." (Dkt. No. 1, p. 28, Services Agreement, ¶ 14). Although Total Press does not concede that Pennsylvania law applies with regard to consequential damages, "courts will generally enforce choice-of-law clauses," because "contracts should be interpreted so as to effectuate the parties' intent." *See AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) (citations omitted). Given the clear language of the contract, the Court will apply Pennsylvania law in interpreting the Services Agreement between Plaintiffs and Total Press.

failing to make timely payments, and "[s]uch material breaches excused Total Press from performing any further obligations under the contract." (*Id.*, p. 12). Total Press states that Plaintiffs "unilaterally elected to make only a partial payment with regard to one of the scheduled payments," and their "failures to timely or completely meet their payment obligations are material breaches of the contract and constitute failures . . . under the Services Agreement." (*Id.*, p. 11). Total Press claims that Plaintiffs also "failed in their obligation to provide a clear and safe construction area in that they failed to move pre-existing equipment within the site to accommodate the installation of the subject press and failed to complete railings on the mezzanine in contravention of OSHA requirements." (*Id.*).

In response, Plaintiffs assert that their performance is not an essential element of a breach of contract claim under Pennsylvania law, and even if it was, "Total Press' argument that Plaintiffs failed to perform under the Services Agreement is meritless." (Dkt. No. 70-1, p. 25). Plaintiffs further claim that they made all necessary payments to Total Press before discovering the damage to the Press, and because of that damage, Total Press was unable to fully complete certain milestones. (*Id.*, p. 26).

Under Pennsylvania law, to establish a claim for breach of contract, a complaining party "must prove the following elements: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages." *Dempsey v. Bucknell Univ.*, 76 F. Supp. 3d 565, 585 (M.D. Pa. 2015) (citing *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006)). And generally, "[a] material breach by one party to a contract entitles the non-breaching party to suspend performance." *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003). "If a breach constitutes a

material failure of performance, then the non-breaching party is discharged from all liability under the contract." *Id.*  Whether a breach is material is an issue of fact unless the question "admits only one reasonable answer."  *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008).

Here, the parties dispute their respective obligations under the Services Agreement, especially after the Press was damaged during the unloading process.  Notably, Vanguard's former Vice President of Manufacturing, William Post, testified that employees from Total Press and Britton Services were present in Ithaca during the unloading process, during which he stated much of the alleged damage occurred, and that Total Press and its agents caused damage to the press through their improper care.  (Dkt. No. 55-6, pp. 65–73, 99–110).  Mr. Post also testified that he did not know why Total Press and Britton stopped working on the reassembly of the Press, (Dkt. No. 55-6, pp. 90, 116–17), but he claimed that "the stoppage of work by Britton was due primarily, if not exclusively, to the lack of payment by Total Press; the other alleged issues did not prevent Britton from continuing to work on the Press installation."  (Dkt. No. 70-5, ¶ 3).  And because Britton stopped its installation work, Mr. Post stated that Plaintiffs had to hire a new company to install the Press after it had been repaired.  (*Id.*, pp. 88–90).

On the other hand, Total Press asserts that "payment was necessary to allow [Britton] to continue to conduct the work that was required to meet the contract obligation." (Dkt. No. 74, p. 13).  Total Press argues that "the damage itself did not breach the contract as it was not irreparable and could have been remedied within the allotted time frame." (*Id.*).  Total Press further claims that Plaintiffs' missed payments made it impossible for Total Press's subcontract with Britton to continue with the installation of the Press and

14

forced Britton to cease its efforts to repair the Press.  (*Id.*, p. 14).  Mr. Vargo testified that

Plaintiffs were "never current" in their installment payments under the contract, and that

after the damage occurred during the unloading process, Plaintiffs would not allow Total

Press to assess the extent of the damage.  (Dkt. No. 55-7, pp. 250–53, 289–91).  He stated

that Total Press and Britton both withdrew from the job in mid-September 2016, which he

attributed directly to Vanguard's alleged "nonpayment."  (*Id.*, pp. 292, 316).  Mr. Vargo

also testified that, before Total Press and Britton stopped work and left the jobsite, there

were disagreements between Total Press and Plaintiffs about the repair process and how the

project would continue.  (*Id.*, pp. 310–12).  Mr. Vargo stated that, despite the damage to the

Press, "it was manageable and our idea at the time was . . . to take responsibility through . . .

Britton and through Weiss-Rohlig."  (*Id.*, p. 319).  Mr. Vargo stated that "no matter who

[Vanguard] hired was to fix whatever happened and for us to finish our commitment . . . .

[a]nd that's what we were not allowed to do."  (*Id.*).

On this record, it is clear that the parties offer vastly different versions of events

regarding their understanding of the Services Agreement and their performance of its terms.

After carefully reviewing the evidence cited by the parties, the Court finds that there are

issues of fact as to whether the parties' actions materially breached the contract, which

necessarily creates further questions as to their obligations to continue performance.

Weighing this evidence is a task reserved for the trier of fact.  Accordingly, Total Press's

motion for summary judgment on Plaintiffs' breach of contract claim must be denied.  *See*

*Alliance Shippers*, 438 F. Supp. 3d at 335–37 (allowing Carmack Amendment and breach of

contract claims to proceed as alternative theories for trial where issues of fact regarding the

parties' obligations and roles precluded the court from making findings as a matter of law).

### b. Tort Claims

Plaintiffs assert a number of negligence-based tort claims against Total Press, including a claim for negligent hiring, retention, and supervision of its subcontractors—namely Britton. (Dkt. No. 1, pp. 13–15).  Total Press argues that these claims "lack merit" and are otherwise duplicative of each other.  (Dkt. No. 55-2, pp. 8–11).  In response, Plaintiffs contend that Total Press "has not met its burden of establishing that it is entitled to summary judgment with respect to Plaintiffs' negligence-based causes of action."  (Dkt. No. 70-1, pp. 21–24).

Under Pennsylvania law, in order to establish a cause of action for negligence, the plaintiff must prove the following elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages.  *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005). However, Pennsylvania law also recognizes the "gist of the action doctrine," which "foreclose[s] tort claims: (1) arising solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim."  *Reardon v. Allegheny Coll.*, 926 A.2d 477, 486 (Pa. Super. 2007) (citing *Hart v. Arnold*, 884 A.2d 316, 340 (Pa. Super. 2005)).  "The critical conceptual distinction between a breach of contract claim and a tort claim is that the former arises out of 'breaches of duties imposed by mutual consensus agreements between particular individuals,' while the latter arises out of 'breaches of duties imposed by law as a matter of social policy.'" *Id.* at 486–87 (citations omitted).  Simply put, "[t]he gist of the action doctrine precludes tort

claims where the true gravamen, or gist, of the claim sounds in contract." *Apple Am. Grp., LLC v. GBC Design, Inc.*, 294 F. Supp. 3d 414, 420 (W.D. Pa. 2018).

Here, the Court finds that Plaintiffs' negligence claims simply recharacterize their breach of contract claim, which is the gist of the action in this case. Specifically, the duties alleged by Plaintiffs exist only by way of the parties' various Services Agreements to provide "turn-key" delivery of the Press from Denmark. (*See generally* Dkt. No. 1, pp. 19–43). Plaintiffs allege that "Total Press owed Plaintiffs a duty of reasonable care in the loading, storage, transportation, unloading, and re-assembly of the Press," but that duty was spelled out in the Services Agreement. (*Id.*, p. 13). Accordingly, Plaintiffs' negligence claims (Dkt. No. 1, pp. 13–14, Complaint, Causes of Action Four and Five) are duplicative and must be dismissed. *See Williams v. Hilton Grp. PLC*, 261 F. Supp. 2d 324, 327–30 (W.D. Pa. 2003) (dismissing the plaintiffs' tort claims where the disputed "conduct occurred mostly during performance of the [parties'] agreement"); *Canters Deli Las Vegas, LLC v. FreedomPay, Inc.*, No. 19-CV-3030, 2020 WL 2494701, at *10–11, 2020 U.S. Dist. LEXIS 84867, at *25–30 (E.D. Pa. May 14, 2020) (dismissing the plaintiff's tort claims based on the gist of the action doctrine "[b]ecause the duty breached [was] one contractually created by the parties").

### c.  Strict Liability Claim

Total Press further asserts that Plaintiffs' common law strict liability claim fails because "Total Press was not a common carrier," and "the common law rule [is] only applicable to common carriers, which Total Press is not." (Dkt. No. 55-2, pp. 12–13). In response, Plaintiffs assert that "Total Press did act as a 'carrier' with respect to the Press" and "Total Press effectively agreed to a strict liability standard under the Services Agreement." (Dkt. No. 70-1, p. 28).

17

As noted above, there are material issues of fact as to whether Total Press acted as a carrier for purposes of Plaintiffs' Carmack Amendment claim.  That finding applies equally to Plaintiffs' strict liability claim.  In any event, if a jury found that Total Press *was* a carrier, then Plaintiffs' strict liability claim would be duplicative of its Carmack Amendment claim.  Conversely, if a jury found that Total Press *was not* a carrier, then Plaintiff's strict liability claim would otherwise be covered under Plaintiffs' breach of contract claim.  Indeed, Plaintiffs state that "Total Press effectively agreed to a strict liability standard under the Services Agreement, which expressly states that 'Total Press assumes all liability for loss to property at the Current Site and at Koursa's Site due to Total Press', its employees, agent or subcontractors actions or negligence during the performance of Services and Commissioning periods.'"  (Dkt. No. 70-1, p. 28).  Accordingly, Plaintiffs' strict liability claim (Dkt. No. 1, pp. 12–13, Complaint, Cause of Action Three) is duplicative and must be dismissed.

### d.  Bailment Claim

Total Press also argues that Plaintiffs' bailment claim must be dismissed because it is duplicative of their breach of contract claim.  (Dkt. No. 55-2, pp. 13–14).  Total Press states that its "obligation was to provide plaintiffs with a functional press by November 9, 2016," and it "was in the process of meeting that obligation when plaintiffs' breaches and non-payment made further progress impossible."  (Dkt. No. 74, p. 15).  In response, Plaintiffs assert that their bailment claim should survive if the breach of contract claim is dismissed.  (Dkt. No. 70-1, pp. 29–30).

Reviewing the Complaint, it is clear that Plaintiffs' claims for breach of contract and bailment are both premised on Total Press's alleged failures to meet is contractual obligations under the parties' Services Agreement.  As discussed above, Plaintiffs' breach of contract

claim is at the heart of this case and will proceed to trial.  Accordingly, Plaintiffs' bailment cause of action (Dkt. No. 1, pp. 15–16, Complaint, Cause of Action Six) is duplicative and must be dismissed.

### e.  Nature of the Damages[5]

Total Press claims that "Plaintiffs have failed to set forth a prima facie case for lost profits or lost labor costs," and that the evidence presented of "lost profits is the epitome of speculative." (Dkt. No. 55-2, pp. 7–8).  In response, Plaintiffs assert that their consequential damages can be measured by specific printing work they claim to have lost due to Total Press's alleged breach of contract.  (Dkt. No. 70-1, pp. 15–21).  Plaintiffs claim that "Total Press was on notice that damage to, or delay of, the Press would result in Plaintiffs incurring lost profits." (*Id.*, p. 15).

Under Pennsylvania law, the general rule for determining lost profits in a suit for breach of contract "permits recovery of lost profits when there is evidence to establish them with reasonable certainty, there is evidence to show that they were the proximate consequence of the wrong, and [that] they were reasonably foreseeable." *Quinn v. Bupp*, 955 A.2d 1014, 1021 (Pa. Super. Ct. 2008) (internal quotations omitted).  Lost profits amount to the difference between that which the plaintiff actually earned and that which the plaintiff would have earned

---

[5] The choice of law provision within the Services Agreement requires the Court to apply Pennsylvania law as to damages. (*See* Dkt. No. 1, p. 28 ("This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Commonwealth of Pennsylvania.")).  Indeed, "New York Courts routinely refer to the Second Restatement [of Conflict of Laws] as authority for conflict-of-law principles governing contracts," and rely upon the "rule that where the parties have validly chosen a state's law to govern the interpretation of their contract, that same law will determine the award of prejudgment interest." *Granite Ridge Energy, LLC v. Allianz Global Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 392–93 (S.D.N.Y. 2013).  The Restatement declares that "where parties have validly chosen a state's law to govern their contractual rights and duties, that same state's substantive law will govern the measure of recovery for breach of contract." *Id.* at 392 (citing The Restatement (Second) of Conflict of Laws §§ 187, 207).

absent the defendant's breach.  *Smith v. Penbridge Assocs.*, 655 A.2d 1015, 1021 (Pa. Super. Ct. 1995).  Mere uncertainty regarding the damage amount does not bar recovery when it is clear that damages resulted from the defendant's conduct.  *Id.*

After careful review of the record, the Court finds that Plaintiffs have presented sufficient evidence to show that they had several printing contracts or potential projects that were disrupted or lost due to the delays resulting from the alleged damage to the Press.  (*See* Dkt. No. 70-1, pp. 15–21).  Specifically, Plaintiffs allege that the Services Agreement required Total Press to transport and install the Press by early November 2016.  (*Id.*, p. 18).  Plaintiffs allege total damages of $3,000,662, which includes certain consequential damages based on lost business income, lost labor savings, and delay costs. (Dkt. No. 74-2, p. 5; *see also* Dkt. No. 70, ¶¶ 44–78).[6]  Plaintiffs claim that they would have run commercial printing jobs between September 2016 and May 2017, but they were unable to take on new projects due to Total Press's alleged breach.  (Dkt. No. 70-1, p. 18).  Indeed, Mr. Post testified that Vanguard would have lost printing business from several weekly magazine publications due to the delayed installation of the Press.  (*See* Dkt. No. 55-6, pp. 154–61).  And Plaintiffs' claims regarding lost printing work are supported by declarations from officials at companies that intended to award them printing contracts.  (*See* Dkt. Nos. 70-3, 70-4).

Based on this evidence, Plaintiffs have at least raised a material issue of fact as to whether the alleged installation delays caused by damages to the Press resulted in recoverable lost profits.  (*See generally* Dkt. No. 70, ¶¶ 44–78).  Therefore, summary judgment is not appropriate on the issue of damages.  *See Short v. Conn. Cmty. Bank, N.A.*, No. 09-CV-1955, 2012 WL 1057302, at *14–17, 2012 U.S. Dist. LEXIS 42617, at *47–56 (D. Conn. Mar. 28,

---

[6]  The Court notes that Total Press failed to respond to Plaintiffs' factual assertions in the Counterstatement of Material Facts.  (*See* Dkt. No. 70, pp. 6–23; Dkt. No. 74).

2012) ("This Court concludes that triable issues exist with respect to the availability of both categories of damages based on the Plaintiffs' claims.  Summary judgment excluding such damages from the jury's consideration is therefore not proper.").

### B.  Trans American's Motion for Summary Judgment

Next, Third-Party Defendant Trans American moves for summary judgment on each of Total Press's third-party claims.  (*See* Dkt. Nos. 56, 63, 73).  Total Press opposes the motion. (Dkt. No. 69).  Total Press's Third-Party Complaint asserts four causes of action against Trans American: (1) contractual indemnification/contribution; (2) breach of contract; (3) common law indemnification/contribution; and (4) a Carmack Amendment claim.  (*See generally* Dkt. No. 15).

#### 1.  Contract and Common Law Claims

Trans American asserts that Total Press's "contractual claims should fail, as there is no contract between Total Press and Trans American."  (Dkt. No. 63, p. 3).  Trans American further contends that Total Press's common law indemnification claim also fails "as the parties did not deal with each other and there is no relationship between the parties to create such an obligation."  (*Id.*).  In response, Total Press argues that there is evidence that certain components of the Press were damaged while it was being stored by Trans American.  (*See* Dkt. No. 69, pp. 3–4; *see also* Dkt. No. 55-6, pp. 93–100).

Generally, "[t]o establish a claim for common-law indemnification, 'the one seeking indemnity must prove not only that it was not guilty of any negligence beyond the statutory liability but must also prove that the proposed indemnitor was guilty of some negligence that contributed to the causation of the accident.'"  *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 31 (N.D.N.Y. 2012) (quoting *Perri v. Gilbert Johnson Enters., Ltd.*, 14 A.D.3d 681, 684–85

(2d Dep't 2005)).  Unlike indemnification, contribution generally operates to apportion liability among tort-feasors regardless of the underlying theory of liability.  *McDermott v. New York*, 50 N.Y.2d 211, 216 (1980).  "Where a party is held liable at least partially because of its own negligence, contribution against other culpable tort-feasors is the only available remedy." *Glaser v. M. Fortunoff of Westbury Corp.*, 71 N.Y.2d 643, 646 (1988).

Here, there is no evidence of any enforceable contract between Total Press and Trans American.  (*See* Dkt. No. 56-24, ¶ 27; Dkt. No. 69-2, ¶ 27).  Thus, Total Press's claims for breach of contract and/or contractual indemnification/contribution (Dkt. No. 15, Third-Party Complaint, Causes of Action 2 and 7) must be dismissed.  *See Roberts v. Karimi*, 251 F.3d 404, 407 (2d Cir. 2001) (stating that "a plaintiff in a breach of contract case must prove . . . that an enforceable contract existed").

Furthermore, Total Press cannot sustain a claim for common law indemnification and contribution because it has adduced no evidence of negligence by Trans American.  The parties agree that Trans American was only involved in the storage and over-the-road carriage of a few flatbed tractor-trailer loads.  (*See* Dkt. No. 56-24, ¶¶ 4, 29; Dkt. No. 69-2, ¶¶ 4, 29).  It is also undisputed that the Press remained in storage for over one year, even though it was not prepared for long-term warehousing.  (*See* Dkt. No. 56-24, ¶¶ 14, 22; Dkt. No. 69-2, ¶¶ 14, 22; *see also* Dkt. No. 55-7, p. 260).  Total Press contends that the Press was damaged while it was kept in storage, but the basis for that theory is that damages (i.e. frozen heat exchangers) occurred due to a lack of preparation for long-term storage, not because of any negligence by Trans American.  (*See* Dkt. No. 56-24, ¶¶ 24–25; Dkt. No. 69-2, ¶¶ 24–25; *see also* Dkt. No. 55-6, pp. 93–100).

Total Press has presented no evidence that Trans American was responsible for preparing the Press for long-term storage. And Total Press has not presented any evidence that the Press was damaged during loading or transport by Trans American. (*See* Dkt. No. 56-24, ¶ 30–31; Dkt. No. 69-2, ¶¶ 30–31). Indeed, Mr. Vargo stated that he was present at the Trans American warehousing facility when the Press components were loaded for shipment to Ithaca, and that he did not recall having any concerns about how the equipment was loaded. (Dkt. No. 55-7, p. 266). He also stated that he was not aware of any service that trans American was retained to perform, but failed to provide. (*Id.*, pp. 274–75). Notably, all of the delivery receipts for Trans American's loads were signed by Plaintiffs without exception, (*see* Dkt. No. 56-24, ¶ 32; Dkt. No. 69-2, ¶ 32; *see also* Dkt. No. 56-18), and Vanguard's William Post also testified that he was not aware of any specific damages to the Press that could be attributed to Trans American, (*see* Dkt. No. 55-6, pp. 130–31).

Based on the undisputed facts, Total Press has failed to present any evidence linking Trans American to the alleged breach of duties and damages involved in this case. Accordingly, Total Press's common law indemnification and contribution claim against Trans American (Dkt. No. 15, Third-Party Complaint, Cause of Action 12) is dismissed.[7]

### 2. The Carmack Amendment

Trans American also moves for summary judgment on Total Press's Carmack Amendment claims. (Dkt. No. 63, pp. 8–9). In response, Total Press concedes that the Carmack Amendment is not applicable against Trans American because the Carmack

---

[7] Although certain damages may have occurred while the Press was being stored, Plaintiffs do not appear to seek losses from Total Press for those specific components (i.e. heat exchangers). (*See* Dkt. No. 1). Thus, because those components are not relevant to the losses identified by Plaintiffs, Total Press may not pursue a third-party claim for their alleged destruction, especially where there is no contract or other evidence indicating that Total Press and Trans American had any contractual relationship whatsoever.

Amendment "governs liability of a carrier to the person entitled to recover under the receipt or bill of lading" and "Total Press is not a party to the Bill of Lading."  (Dkt. No. 69, p. 5). Accordingly, Total Press's Carmack Amendment Claim (Dkt. No. 15, Third-Party Complaint, Cause of Action 17) is dismissed.

### C.  Britton Services' Motion for Summary Judgment

Third-Party Defendant Britton Services Inc. ("Britton") also moves for summary judgment on Total Press's Third-Party Complaint.  (Dkt. No. 62).  Total Press opposes the motion.  (Dkt. No. 69).  Total Press asserts causes of action against Britton for: (1) contractual indemnification/contribution; (2) breach of contract; (3) common law indemnification [and] contribution; and (4) a Carmack Amendment claim.  (*See generally* Dkt. No. 15).

### 1.  Contract Indemnification and Contribution

Britton argues that Total Press's claim for contractual indemnification should be dismissed "because the operative contract is silent on the issue of indemnification."  (Dkt. No. 62-2, pp. 9–10).  Britton states that "the only contract between Total Press and Britton is the June 2, 2016 writing," which "reveals that there is utterly no reference to contractual indemnification by Britton or Total Press."  (*Id.*, p. 10).  Total Press does not respond to Britton's argument with regard to contractual indemnification (*see generally* Dkt. No. 68), and therefore the Court finds that Total Press has abandoned this claim.  *See, e.g.*, *Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").  Accordingly, Total Press's contractual indemnification and contribution claim (Dkt. No. 15, Third-Party Complaint, Cause of Action 1) is dismissed.

### 2. Breach of Contract

Britton also asserts that Total Press's breach of contract claim should be dismissed because "Total Press' failure to issue timely progress payments precluded Britton from completing its work at the project and there is no other evidence that Britton ever breached the contract." (Dkt. No. 62-2, pp. 10–12). Britton asserts that "there is utterly no evidence that Britton breached any aspect of its contractual obligations to Total Press (or Vanguard for that matter)." (*Id.*, p. 10). As for the "pause" of work on September 12, 2016, Britton claims the "only reason Britton left the jobsite was due to weeks of Total Press' failure to make timely progress payments." (*Id.*, pp. 11–12). Britton contends that its failure to continue work was justified based on "Total Press' repeated failures to honor its own contractual obligations" and "repudiation of the contract." (*Id.*, p. 12).

In response, Total Press asserts that its failure to make timely payments resulted from Vanguard's failure to comply with its contractual obligations to Total Press. (Dkt. No. 68, pp. 3–4). Total Press contends that its breach of contract claim against Britton must "rise and fall" with Vanguard's contract claims against Total Press because there is no breach alleged by [Vanguard] that is attributable solely to the actions of Total Press," and its "liability in this matter is entirely based upon the action of other parties, including Britton, who was the party responsible for unloading and installation of the [Press]." (*Id.*, p. 4).

Here, Britton's role in causing the damage to the Press is squarely at issue. The record shows that Britton's representatives acknowledged responsibility for the damage while their crew was unloading the Press in Ithaca. (*See* Dkt. No. 70, ¶ 15). Britton's Lead Pipefitter, Andrew Lawson, testified that the damage to "the magenta unit" occurred when Britton employees lowered the unit onto wooden blocks that "exploded" while the unit was resting on

them.  (Dkt. No. 55-5, p. 52).  Lawson described the damage as an "accident," and noted that Britton had obtained the blocks specifically for this project.  (*Id.*, p. 53).  None of the parties dispute that the damage to the Press during the unloading process was at least a partial cause for the delays and missed payments that are central to Plaintiffs' claims and alleged damages.  And as discussed above, the record presents issues of fact as to the parties' responsibility for the damage to the Press and their breaches of contractual obligations.  Because there is evidence intertwining Britton with these disputed issues, summary judgment is not appropriate on Total Press's third-party breach of contract claim against Britton.

### 3.  Common Law Indemnification and Contribution

Britton further moves to dismiss Total Press's common law indemnification and contribution claims on the basis that "Total Press did not supervise the means and methods of Britton's actions on the jobsite, and surely Britton employees were not the employees of Total Press."  (Dkt. No. 62-2, p. 14).  Britton asserts that "there is no basis to conclude Vanguard's claims of negligence against Total Press incorporate the independent action of Britton," and "the only remaining claim against Total Press is Vanguard's allegation that Total Press' failure to deliver the Press pursuant to the terms of the contract is a material breach of the agreement." (*Id.*).  In response, Total Press argues that "Britton's motion to dismiss the common law indemnification and contribution causes of action should not be granted unless Total Press's motion with regard to [Vanguard's] claims of liability against Total Press are also granted as [Vanguard's] claims are based entirely on the action of Britton and other third-parties."  (Dkt. No. 68, pp. 4–5).

As with Total Press's third-party claim for breach of contract, there are issues of fact regarding Britton's role in the damage to the Press (*see* Dkt. No. 70, ¶ 15), as well as the

materiality and consequences of the parties' actions and alleged defaults under the Services Agreement.  Accordingly, summary judgment is not appropriate on Total Press's third-party claims for indemnification and contribution against Britton.

### 4.   The Carmack Amendment

Finally, Britton moves for summary judgment on Total Press's Carmack Amendment claim.  (Dkt. No. 62-2, p. 15).  Because Total Press failed to respond to Britton's motion on this claim, the Court deems this claim abandoned.  (*See generally* Dkt. No. 68).  Accordingly, Total Press's Carmack Amendment claim (Dkt. No. 15, Third-Party Complaint, Cause of Action 16) is dismissed.

## V.   CONCLUSION

Wherefore, it is hereby

**ORDERED** that Total Press's Motion for Summary Judgment (Dkt. No. 55) is **GRANTED** as to Plaintiffs' Third, Fourth, Fifth, and Sixth Causes of Action, but is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiffs' First and Second Causes of Action shall proceed to trial; and it is further

**ORDERED** that Trans American's Motion for Summary Judgment (Dkt. Nos. 56, 63) is **GRANTED**; and it is further

**ORDERED** that Trans American is dismissed from this action; and it is further

**ORDERED** that Britton's Motion for Summary Judgment (Dkt. No. 62) is **GRANTED** as to Total Press's First and Sixteenth Third-Party Causes of Action, but is otherwise **DENIED**; and it is further

**ORDERED** that Total Press's Sixth and Eleventh Third-Party Causes of Action against Britton shall proceed to trial; and it is further

**ORDERED** that the Clerk of the Court is directed to confer with the remaining parties to schedule a status conference in preparation for trial.

**IT IS SO ORDERED.**

Date:   October 13, 2020
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge